**Affirmed and Memorandum Opinion filed October 27, 2016.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-16-00395-CV

---

### IN THE INTEREST OF L.A.M., A CHILD

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2015-02316J**

---

### M E M O R A N D U M   O P I N I O N

Appellant T.A.H. ("Mother") appeals the trial court's final decree terminating her parental rights and appointing the Department of Family and Protective Services ("the Department") as sole managing conservator of her child L.A.M. ("Lucy").[1] On appeal Mother challenges the legal and factual sufficiency of the evidence to support (1) the predicate grounds under which her parental rights

---

[1] We use pseudonyms to refer to appellant and her child in this case. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

were terminated, and (2) the finding that termination was in Lucy's best interest. We affirm.[2]

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A. Pretrial Removal Affidavit

On October 9, 2014, the Department received a referral alleging neglectful supervision of Lucy by her alleged father, A.M., Jr. ("A.M.").[3] According to the referral, A.M. physically assaulted Mother in the family's vehicle while Lucy, who was two months old at the time, was present. During an argument over gas money, A.M. slapped Mother and pulled her hair while threatening to remove her from the vehicle. Mother moved into the backseat of the vehicle near Lucy, and A.M. continued to assault her. Mother stated that A.M. began to "punch and pull her" while she held Lucy. A.M. began to choke Mother, who said she started to lose consciousness and could not breathe. The Houston Police Department was contacted, but A.M. fled the scene before officers arrived. Mother had visible signs of injury. Lucy, however, did not sustain any injuries during this altercation.

According to Mother, A.M. had assaulted her a few days prior to this incident in the home. Although Mother attempted to escape from A.M., he dragged her back into the house. Mother sustained a bruise on her arm. Again, Lucy was present during this incident.

Jessica Abbott, an investigative caseworker for the Department, attempted to contact Mother repeatedly following the referral of her case. On October 20, 2014, Abbott contacted law enforcement to perform a welfare check on Lucy. Law

---

[2] The trial court also terminated the parental rights of Lucy's unknown father during the same proceeding.

[3] On December 15, 2015, the trial court granted the Department's motion for partial nonsuit as to A.M.

2

enforcement reported that Lucy appeared healthy and that Mother had no visible marks or bruises.

Subsequently, Abbott met with Mother, who stated she was on probation for committing aggravated assault and evading arrest when she was 17 years old. According to Mother, she had been in a previous relationship that involved domestic violence. Mother minimized the domestically violent incident with A.M., whom she reported had been arrested.

Mother signed a Child Safety Plan in which she agreed to be protective of Lucy, to prohibit contact between A.M. and Lucy, and to reside in the home of Lucy's maternal grandfather, C.H. ("Grandfather").

Abbott also spoke with Mother's probation officer, Lisa Smith. Smith reported that Mother is part of her "high risk" caseload and that she has repeatedly advised Mother that her living situation with A.M. is unsafe. Smith also warned Mother that if A.M. is affiliated with a gang, Mother would be violating the terms of her probation.

On November 12, 2014, Abbott again requested a welfare check on Lucy after repeatedly attempting to contact the family.

Shortly thereafter, Mother's case was transferred to the Family Based Safety Services unit. Caseworker Tonya Kinard met with Mother who reported that she was not getting along with Grandfather. Mother expressed a desire to move in with A.M.'s mother.

Mother's case was then reassigned to caseworker Susie Sims, who met with Mother and Lucy for an assessment. During the assessment, Mother denied any domestic violence. Mother repeated her desire to move in with A.M.'s parents and stated she wanted to continue her relationship with A.M. Sims also met with A.M.

at the Harris County Jail for an assessment. A.M. denied any domestic violence and also expressed his desire to continue a relationship with Mother.

In January 2015, in an attempt to effectuate Mother's desired living situation, Sims met with A.M.'s mother, father, and sister to conduct a home study. The home was determined to be unsafe, however, because A.M. would have easy access to Mother and Lucy upon his release from jail. A.M. was planning to move in with his parents following his release.

On the same day as the home study, Sims also spoke with Mother's probation officer. According to the probation officer, Mother was not in compliance with her probation because she had failed to pay probation fees and court fees as well as failed to perform any community service.

On January 8, 2015, Mother signed a Child Safety Plan in which she agreed to prohibit unsupervised contact between A.M. and Lucy, to continue residing with Grandfather, to be protective of Lucy, and to participate in an assessment as well as counseling. Sims met with Mother to emphasize the seriousness of her situation and to explain the consequences of not complying with her services.

Subsequently, Sims received a Psychosocial Report following Mother's assessment. The report recommendations for Mother included parenting classes, individual therapy, identifying a plan and resources to help her care for Lucy, and to abstain from "despairing conversation" and physical contact with A.M.

On January 31, 2015, A.M. was released from jail. Following his release, A.M. assured Sims that he wanted to participate in Family Based Safety Services. However, A.M. later stated he had started working and could not participate in the services.

In March 2015, Mother's counselor reported that Mother was not responding to telephone calls and had missed three scheduled counseling sessions. Sims went to meet Mother for a scheduled visit at home, but Mother was not there. According to a relative, Mother and Lucy had not been at the house for a "number of days." The following day Sims tried to meet Mother for another scheduled visit. Again, Mother was not at home.

On April 6, 2015, Sims went to meet Mother for a scheduled visit, and, again, Mother did not show. Sims spoke with Grandfather who said he did not know where Mother was, but she and Lucy were not staying at the house every night.

On April 9th and 10th, Sims attempted to schedule a family team meeting with Mother, but Mother was "resistant, uncooperative, and non-committal." Sims tried to schedule the meeting again a few days later. However, Mother became agitated and started screaming at Sims that she was interfering with Mother's ability to raise Lucy.

On April 14, 2015, the Department filed its original petition for termination of the parents' rights to Lucy, alleging termination was warranted with regard to Mother because she:

- knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, pursuant to §161.001(b)(1)(D), Texas Family Code;

- engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the children, pursuant to §161.001(b)(1)(E), Texas Family Code;

- constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the

5

Department of Family and Protective Services or an authorized agency for not less than six months and: (1) the Department or authorized agency has made reasonable efforts to return the children to the mother; (2) the mother has not regularly visited or maintained significant contact with the children; and (3) the mother has demonstrated an inability to provide the children with a safe environment, pursuant to §161.001(b)(1)(N), Texas Family Code; and

- failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the children, pursuant to §161.001(b)(1)(O), Texas Family Code.

## B. Trial

Trial was scheduled to commence on March 31, 2016. However, Mother was unable to appear because she was in jail following a probation violation. Subsequently, trial to the court was held on April 21, 2016.

### 1. Documentary evidence

At trial, before any witness testimony, the Department introduced the following into evidence without objection: the citation for service on Mother; a certificate containing jurisdiction to demonstrate that Lucy had not been the subject of a suit affecting the parent-child relationship in which a judgment was entered on or after January 1, 1974; a certificate of paternity registry search to establish that no notice of intent to claim paternity had been filed; Lucy's birth certificate; Mother's results from three separate drug tests; and a copy of Mother's evaluation from the Children's Crisis Care Center. The evidence showed that Mother tested positive for illegal drug use in April 2015, June 2015, and September 2015. The

6

evidence further showed that Mother participated in a family evaluation at the Children's Crisis Care Center in May 2015. The evaluation report included a complete recitation of the pretrial removal affidavit. The report further revealed Mother's self-reported history of drug abuse since the age of fifteen. According to the report, Mother confirmed her criminal history but refused to discuss the charges. Although the clinician noted Mother's multiple strengths, including expressing her love and commitment for Lucy, the clinician expressed concerns about Mother's failure to recognize the seriousness of the Department's involvement as well as Mother's denial and/or minimization about the impact of substance abuse on her life. According to the report, Mother's addiction issues interfere with her ability to make clear decisions and to respond appropriately to Lucy's needs.

### 2. Testimony

At trial, the Department's caseworker, Cheryl Craver, testified that in addition to A.M., another individual, T.E., was named as Lucy's alleged father in this case. Both A.M. and T.E. were eliminated as Lucy's biological parent, however, following DNA testing.

Craver testified that the Department became aware of Lucy following a referral of neglectful supervision in a domestic violence case. The case was initially placed in Family Based Safety Services but was later transferred because Mother was not cooperative. The Department provided Mother with a family plan of service. Mother partially complied with her service plan by completing a substance abuse assessment and a psychological evaluation but, according to Craver, failed to complete all of the services on her plan.

Craver testified that Mother was on probation when the case was referred to the Department and failed to comply with the terms of her probation. Mother's

7

probation officer had contacted Craver to report that Mother was engaging in illegal activities and was in a relationship with a known drug felon.

Craver stated that Mother had submitted to drug tests during the pendency of this case and tested positive for marijuana and cocaine on at least three occasions. Craver believed that Mother's continued drug use during the case as well as her involvement with the criminal justice system posed a danger to Lucy. Craver testified that Mother's visitations with Lucy were stopped at one point due to Mother's criminal activity. An investigator in the probation department contacted Craver to express concerns about Mother visiting with Lucy. Subsequently, the Department decided it was in Lucy's best interest to cease visitations from Mother.

Craver testified that Mother was offered services prior to the initiation of the instant suit but failed to complete her services, despite having more than a year in which to do so. In light of Mother's failure to comply with the court-ordered family service plan as well as her continued drug use, the Department was seeking termination of Mother's parental rights.

At the time of trial, Lucy was two years old and had been living in a potentially adoptive foster home for several weeks. Craver testified that Lucy had been visiting with the foster parents prior to her placement and that a bond had been formed.

Craver also stated that Mother had not visited Lucy since December. Initially, Mother simply stopped contacting Craver about visitations. At the time of trial, Mother was unable to visit because she was incarcerated.

Craver testified that she had contacted both Lucy's maternal grandmother ("Grandmother") and Grandfather regarding potential placement of Lucy. The Department conducted a home study of Grandfather's home, but it was not

approved because his daughter, who has a criminal history, was living there and his work schedule as a truck driver required him to be absent from the home often.

A home study on Lucy's maternal grandmother, who lived in Missouri, was attempted as well through the Interstate Compact on the Placement of Children However, the home study was denied because Grandmother refused to complete all of the required paperwork as well as provide fingerprints, and ultimately declared that she was no longer interested in doing a home study. According to Craver, Grandmother understood why the home study was denied but did not believe Mother's parental rights should be terminated. Although Grandmother stated that she wanted to keep Lucy until she could be reunited with Mother, she was unwilling to adopt Lucy.

Craver stated that she offered visits to the grandparents at the previous court hearing. They had a visit with Lucy at that time but were ready to leave after approximately twenty minutes. Craver was uncertain about whether either grandparent had a relationship with Lucy.

Craver testified that she believed the Department exhausted all reasonable efforts to place Lucy with a relative and that it was in Lucy's best interest to remain in her foster home so that she could be adopted.

On cross-examination Craver stated that Mother had completed her domestic violence classes, anger management classes, and parenting classes. Mother's visits throughout the case were inconsistent, but she remained in contact with Craver, appeared at all court hearings, and emphasized from the beginning that she wanted to keep Lucy. After she started her services, however, Mother went to jail. According to Craver, Mother had been in jail since at least February.

Child Advocate LeJoi Toliver testified as well, recommending termination of Mother's rights and that Lucy remain in her current placement. Toliver had an opportunity to speak with both Grandfather and Grandmother regarding the potential placement of Lucy. Toliver expressed concerns that Grandfather would not be "consistently protective" and might return Lucy to Mother. Toliver believed that Grandfather had a relationship with Lucy. Grandmother, however, had lived out of the state since Lucy was born. Toliver also expressed concerns that if Lucy was placed with Grandmother, Grandmother might return Lucy to Mother. Although Toliver explained her concerns to Grandmother about Mother's ability to parent, Grandmother did not understand why Lucy could not be returned to Mother.

Mother also testified on her own behalf. Mother had been in an Intermediate Sanction Facility since March 18, 2016. Mother testified that she did not understand that the Department was seeking to terminate her parental rights. Based on the paperwork she received, Mother believed the Department was seeking reunification.

Mother acknowledged that an important step in achieving reunification would be remaining drug-free but conceded that she continued to use drugs during the pendency of the case. Mother also recognized that using drugs was a violation of her probation but said she asked for help. Mother agreed that engaging in the use of marijuana and cocaine was not good parenting but stated that she never used drugs around Lucy.

On cross-examination Mother explained that she previously asked if she could seek treatment at Bonita House and bring Lucy with her. According to Mother, that option was not approved by probation, so "that's why they locked [her] up to put [her] in their own rehab for themselves." Mother anticipated being

10

released from the in-custody treatment facility on September 18, 2016, and her plan was to "get out, stay clean, to finish [her] probation on adjudification (sic), to get it expunged and to get a job." Mother asked the court to refrain from terminating her parental rights and to allow her more time to work her services.

Regardless of the court's decision on termination, Mother stated that she wanted Lucy placed with Grandfather or, alternatively, Grandmother. Mother had been in contact with Grandfather for months about taking care of Lucy. Mother stated Grandfather had always been willing to take Lucy. Mother also stated that she was willing to do anything necessary to have Lucy placed with family.

Finally, Grandfather testified that he had wanted Lucy placed with him since initial concerns were raised about Mother being able to take care of Lucy. Grandfather stated he had been in constant communication with the Department. Grandfather testified that he no longer had any adult children living with him and that only his older brother lived in the house. Grandfather stated that he would quit one of his two jobs in order to care for Lucy. His new schedule would allow him to have nights off, and he would arrange for Lucy to be in daycare. Grandfather testified that he had no criminal history and that he could afford to raise Lucy until she was eighteen.

Following arguments by counsel, the court determined Mother's parental rights should be terminated and appointed the Department as sole managing conservator. On April 28, 2016, the trial court signed a final decree for termination pursuant to the predicate findings under Family Code sections 161.001(b)(1)(E), (O), and (P) as well as a finding that termination of the parental rights was in Lucy's best interest.

## II. ANALYSIS

In her first three issues Mother argues the evidence is legally and factually insufficient to support the termination finding under sections 161.001(b)(1)(E), (O), and (P) of the Texas Family Code. Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(b)(1) of the Family Code; and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009).

### A. Standard of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to the clear-and-convincing-evidence standard. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing the legal sufficiency of the evidence in a termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *See J.O.A.*, 283 S.W.3d at 344; *J.F.C.*, 96 S.W.3d at 266; *C.H.*, 89 S.W.3d at 25. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could have disbelieved. *J.O.A.*, 283 S.W.3d at 344; *J.F.C.*, 96 S.W.3d at 266.

In reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence, including disputed or conflicting evidence. *J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

## B. Predicate Termination Grounds

Mother concedes the legal and factual sufficiency of the evidence to support termination of her parental rights under subsection (P).[4] Because the judgment

---

[4] Section 161.001(b)(1)(P) of the Family Code provides for termination of the parent-child relationship based on a finding by clear and convincing evidence that the parent:

(P) used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and:

(i) failed to complete a court-ordered substance abuse treatment program; or

could be upheld on this unchallenged ground, we uphold the judgment concerning the statutory grounds for termination and do not address Mother's arguments as to (E) or (O). *See In the Interest of N.S.*, 14-15-00601-CV, 2015 WL 9240920, at *3 (Tex. App.—Houston [14th Dist.] Dec. 15, 2015, no pet.) (mem. op.). Accordingly, we overrule Mother's first three issues.

### C. Best Interest of the Child

In her fourth issue Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights is in Lucy's best interest. A strong presumption exists that the best interest of the child is served by keeping the child with the child's natural parent, and the burden is on the Department to rebut that presumption. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Proof of acts or omissions under section 161.001(b)(1) is probative of the issue of the child's best interest. The factors the trier of fact may use to determine the best interest of the child include: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *U.P.*, 105 S.W.3d at 230; *see also*

---

(ii) after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance.

Tex. Fam. Code Ann. § 161.001(b)(1)(P).

14

Tex. Fam. Code Ann. § 263.307(b) (West 2014) (listing factors to consider in evaluating parents' willingness and ability to provide the child with a safe environment). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley,* 544 S.W.2d at 371–72.

We begin with the presumption that Lucy's best interest is served by keeping her with her natural parent. *See In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). We also presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. *See* Tex. Fam. Code Ann. § 263.307(a).

### 1. Needs of and Danger to the Child

A parent's drug use supports a finding that termination is in the best interest of the child. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.). The factfinder can give "great weight" to the "significant factor" of drug-related conduct. *In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.); *see also In re B.G.*, No. 14–14–00729–CV, 2015 WL 393044, at *7 (Tex. App.—Houston [14th Dist.] Jan. 29, 2015, no pet.) (mem. op.) (considering a parent's criminal and drug histories in affirming the decision that termination was in the best interest of a child). Mother's longstanding history of illegal drug use evinces a course of conduct that a factfinder reasonably could conclude endangers Lucy's well-being. The record reflects Mother continued to abuse drugs after the instant case was initiated and was confined to an in-custody drug treatment facility at the time of trial. Accordingly, this factor weighs in favor of the trial court's finding.

## 2. Stability of the Home and Mother's Compliance with Service Plan

In determining the best interest of the child in proceedings for termination of parental rights, the trial court may properly consider that the parent did not comply with the court-ordered service plan for reunification with the child. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013). Although Mother's service plan was not admitted into evidence or made part of the clerk's record on appeal, Department caseworker Craver testified that Mother failed to complete her family plan of service successfully.[5] *See In re A.A.F.G.*, No. 04–09–00277–CV, 2009 WL 4981325, at *3 (Tex. App.—San Antonio Dec. 23, 2009, no pet.) (mem. op.) (testimony regarding service plan's requirements sufficient to support finding under subsection O where plan not admitted into evidence or contained within clerk's record). Mother argues she substantially complied with the service plan, pointing to Craver's testimony that Mother completed the substance abuse assessment, a psychological evaluation, and parenting classes. This court has held subsection O does not provide an exemption for "substantial compliance." *In re M.C.G.*, 329 S.W.3d 674, 676 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). Moreover, as Craver testified, Mother had plenty of time in which to complete her services yet failed to do so. We conclude this factor weighs in favor of the trial court's finding.

## 3. Child's Desires and Proposed Placement

Lucy was an infant at the time of trial, and unable to express her desires. When a child is too young to express her desires, the factfinder may consider that the child has bonded with the foster family, is well cared for by them, and has

---

[5] Mother does not complain of its absence on appeal.

spent minimal time with a parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in the child's best interest. *See In re D.M.,* 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.). A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in the best-interest determination. *See K.C.,* 219 S.W.3d at 931. Therefore, evidence about the present and future placement of the child is relevant to the best-interest determination. *See C.H.*, 89 S.W.3d at 28.

Prior to trial, the Department spent considerable time and effort trying to place Lucy with a family member. The Department was unable to approve placement with Grandfather because an adult child with a criminal history was living in the home and because Grandfather's employment required him to be absent for long periods of time. Although Grandfather testified at trial both that his adult daughter had moved out of the home and that he was willing to quit one of his jobs if Lucy was placed with him, there was no evidence before the court that his circumstances had changed yet. The Department also attempted to place Lucy with Grandmother, but Grandmother refused to cooperate and halted the home study.

At the time of trial, Lucy had been living with a foster family for several weeks. Craver testified that Lucy had been visiting with the foster parents prior to her placement with them and that a bond had been formed. Craver further testified that the foster home was an adoptive placement and that it was in Lucy's best interest to remain in the home. This factor weighs in favor of the trial court's finding.

17

### 4. Parenting Abilities and Family Support

We may also consider Mother's past performance as a parent in evaluating her ability to provide for Lucy and the trial court's determination that termination of her parental rights would be in Lucy's best interest. *See C.H.*, 89 S.W.3d at 28. The record contains evidence supporting the best interest finding based on Mother's drug use, lack of a stable home, and failure to comply with court-ordered services. *See In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) (considering the parent's drug use, inability to provide a stable home, and failure to comply with a family service plan in holding the evidence supported the best interest finding).

Applying the applicable *Holley* factors to the evidence, we conclude that legally and factually sufficient evidence supports the trial court's finding that termination of Mother's rights was in Lucy's best interest. *See S.B.,* 207 S.W.3d at 887–88 (considering the parent's drug use, inability to provide a stable home, and failure to comply with a family-service plan in holding the evidence supported the best-interest finding). Based on the evidence presented, the trial court reasonably could have formed a firm belief or conviction that terminating Mother's rights was in Lucy's best interest so that Lucy could promptly achieve permanency through adoption. *See In re T.G.R.–M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *M.G.D.*, 108 S.W.3d at 513–14. Accordingly, we overrule Mother's fourth issue.

We affirm the judgment of the trial court.


/s/     John Donovan
         Justice

Panel consists of Justices Busby, Donovan, and Brown.